UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DELDRIC BRATCHER,

                     Petitioner,                   **DECISION AND ORDER**
                                                       No. 03-CV-6187

     -vs-

FRANK McCRAY, JR.,

                     Respondent.
_____

## INTRODUCTION

Petitioner, Deldric Bratcher ("Bratcher"), filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on charges of first degree robbery and third degree grand larceny. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On September 27, 1997, the Fleet Bank in the Town of Brighton, New York, was robbed. According to the bank employees, the robber was a black male whose face and head were mostly concealed by a hood and a bandanna and whose hand was covered in a paper bag. The robber stated that he had a gun and threatened to shoot if the bank employees did not comply with his demand for money. The employees handed the robber a package of money ($37,000), which contained with a dye pack, and he left the bank.

As he was driving in the area, Officer Spaker received the dispatch about the robbery

describing the suspect as being a "male black about five-ten." H.7.[1] The witnesses also said that

he was wearing latex gloves, windbreaker-style pants, a hooded sweatshirt, a bandanna, and

white Nike® sneakers with a green stripe.  As Officer Spaker drove his marked police vehicle

southbound on Clover Street, he saw a black male (Bratcher) walking on the shoulder of the road

in the opposite direction at a point about two- or three-tenths of a mile from the bank. H.6-8, 24,

28. After the two men made eye-contact, Officer Spaker turned his vehicle around in the

driveway of the Harley School, momentarily losing sight of the man. Upon re-entering Clover

Street, Officer Spaker again observed Bratcher, who was now running and looking over his

shoulder. H.7. Officer Spaker then saw the man run across the school's athletic field into a

thicket and followed him, stopping his vehicle on an abandoned railroad bed on the opposite side

of the thicket. H.9.

When Bratcher emerged from the thicket, Officer Spaker engaged him in conversation:

"As I recall, I asked him why he was running, and my recollection is that he said that someone

had taken his bicycle, somebody he knew or a friend of his or somebody he - - an acquaintance,

possibly, had taken his bicycle up on Monroe Avenue and didn't return it to him. So I said,

'Well, whereabouts?' And I believe he indicated around the Friendly restaurant area, which is

near [interstate] 590. And that would be about a thousand yards west of the Fleet Bank. So I said,

'Well, okay. Why don't you get in the car, and we'll go look for this guy.'" H.12-13. Uncuffed,

Bratcher entered the police vehicle. Spaker drove past the Friendly restaurant to the nearby Fleet

Bank, where Bratcher was identified by four bank employees in a show-up identification

procedure. H.13.

---

[1] Citations to "H.__" refer to the transcript of the pre-trial suppression hearing.

At trial, two of the bank employees testified about the robbery and their identifications of the suspect. The dye pack that was with the $37,000 stolen by the robber was found exploded inside of a blue pillowcase, located in a white Isuzu Trooper parked halfway in a parking spot backed up to the Pittsford Animal Hospital, which was close to the Fleet Bank. The vehicle was not registered in Bratcher's name. However, the police found the $37,000 strewn about inside the vehicle, along with a blue file containing a purchase offer on a home made by Bratcher and his wife Shanya Scott ("Scott"). In addition, prior to the robbery, Scott was stopped by a police officer while she was driving that vehicle, thereby linking Bratcher to it. The search of the wooded thicket into which Bratcher ran before encountering Officer Spaker revealed more evidence connecting Bratcher to the robbery–a hooded sweatshirt stained with red dye, latex rubber gloves covered in dye, and a bandanna. When Bratcher was arrested, the pants that he was wearing also had dye on them. Laboratory testing revealed that the dye on the items of physical evidence contained a special chemical, methylaminoanthraquinone, which is only used in fabricating dye packs.

The jury returned a verdict convicting Bratcher of first degree robbery and third degree larceny as charged in the indictment. He was sentenced to twelve and one-half to twenty-five years on the robbery conviction with a concurrent sentence of two and one-third to seven years on the grand larceny conviction.

On direct appeal, the Appellate Division, Fourth Department, unanimously affirmed his conviction. However, the court agreed that the trial court erred in overruling Bratcher's objection at sentencing to the prosecutor's unsupported allegations that defendant was involved in a series of other bank robberies and that, in sentencing defendant to the maximum sentence, the court

appears to have taken those unsupported allegations into account. *People v. Bratcher*, 291 A.D.2d 878, 737 N.Y.S.2d 451 (App. Div. 4th Dept. 2002). The Appellate Division accordingly remanded the case for re-sentencing and ultimately affirmed the re-sentence.[2] The New York Court of Appeals denied leave to appeal. Bratcher filed no collateral motions in state court.

This habeas petition was filed on April 16, 2003. All of the grounds for relief raised herein appear to be exhausted and properly before this court. *See* 28 U.S.C. § 2254(b). For the reasons set forth below, the petition is denied.

## DISCUSSION

### Merits of the Petition

### Claim 1.        The police lacked reasonable suspicion to detain petitioner.

Bratcher contends that his Fourth Amendment rights were abridged when Officer Spaker subjected him to a "pat and frisk" without reasonable suspicion. The Supreme Court has explicitly held that Fourth Amendment claims that have been litigated in state court are not cognizable on habeas review:

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force.

*Stone v. Powell*, 428 U.S. 465 (1976); *accord Capellan v. Riley*, 975 F.2d 67, 69-71 (2d Cir. 1992); *Grey v. Hoke*, 933 F.2d 117, 121 (2d Cir. 1991). Here, Bratcher litigated his Fourth Amendment claim at the pretrial suppression hearing and on direct appeal to the Appellate

---

[2] The Court has not been provided with information as to the length of the new sentence.

Division. Thus, state corrective process was not only available to petitioner but was utilized by him in seeking redress for his Fourth Amendment claim. Therefore, the claim cannot support a petition for a writ of habeas corpus. *See*, *e.g.*, *Gandarilla v. Artuz*, 322 F.3d 182, 185 (2d Cir. 2003) ("[T]he merits of a Fourth Amendment challenge are not reviewable in a federal habeas proceeding if a defendant has had a fair opportunity to litigate that question in State court . . . ."); *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002) ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the [state] court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief."). Accordingly, Bratcher's Fourth Amendment claim must be dismissed.

**2.     The show-up identification procedure was unduly suggestive.**

Bratcher argues that the show-up identification procedure, during which all of the witnesses viewed him at the same time, was unduly suggestive. He asserts that their identifications were erroneously admitted at trial.

At the pre-trial hearing, Officer Spaker testified that Bratcher was not handcuffed when he was escorted up to the window on the side of the bank building for the show-up procedure. H.14. Officer Sleep, who conducted the show-up procedure from inside the bank, had the four witnesses (Ragan, Jones, Maureen Miller and Carrie Neufeglise) sit in chairs facing the window. H.39. Bratcher was standing with two uniformed officers outside the window and was told to walk toward the witnesses. Officer Sleep advised the witnesses "to have no conversation and just look at the person" and asked them to remain silent until he asked for an identification. H.39-41. However, after Bratcher walked toward the window, Ragan "blurted out, 'That's him,'" before

-5-

any of the other witnesses said anything. H.40. Officer Sleep testified that he told the witnesses

again that they should not speak. H.41. No other suspects were displayed to the witnesses. H.49.

The remaining three witnesses all identified Bratcher as the robber.

After the hearing, Bratcher's request to suppress the identification was denied. The trial

court made the following findings of fact: (1) that the show-up occurred twenty-five minutes

after the commission of the alleged crime; (2) that Bratcher was not handcuffed and (3) that the

police instructed the witnesses "in neutral language" to view the suspect and to not talk among

themselves. *See* March 5, 1998 Decision (App. A).[3] The court found that "the identification

procedure was not impermissibly suggestive and did not violate the defendant's constitutional

rights." *Id.*

On direct appeal, the Appellate Division held that the "showup was not unduly suggestive

because it was conducted before a group of four witnesses." *People v. Bratcher*, 291 A.D.2d at

878, 737 N.Y.S.2d 451. The Appellate Division conceded that "simultaneous showup procedures

are generally disfavored," but noted that "they are permissible when, as in this case, they are

employed in close spatial and temporal proximity to the commission of the crime for the purpose

of securing a prompt and reliable identification." *Id.* at 878-79 (quotation omitted). The court

also found that there was "no allegation that the conduct of the police was in any way

impermissibly suggestive." *Id.* at 879 (quotation omitted).

Bratcher contends that he was denied his constitutionally guaranteed right to due process

when the state courts failed to suppress the pre-trial, out-of-court "show-up" witness

identification. Longstanding Supreme Court precedent holds that a criminal defendant has the

---

[3] Citations to "App.__" refer to the appendix of exhibits attached to respondent's Answer (Docket #6).

right under the Due Process Clause of the Constitution to be free from suggestive identification

procedures that create a "very substantial likelihood of irreparable misidentification." *E.g.*,

*Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). As the Supreme Court noted in *Stovall v.*

*Denno*, the "show-up," or "[t]he practice of showing suspects singly to persons for the purpose of

identification, and not as part of a lineup, has been widely condemned." 388 U.S. 293, 302

(1967). Bratcher's claim regarding the admissibility of the "show-up" identification is governed

by the standards set forth by the Supreme Court in *Manson, supra*; *Neil v. Biggers*, 409 U.S. 188,

198 (1972); and *Stovall*, 388 U.S. at 302. *See, e.g., Kennaugh v. Miller*, 289 F.3d 36, 43 (2d Cir.

2002).

a.        **Suggestiveness**

As noted above, the first prong of the test inquires into whether the identification

procedure was unnecessarily suggestive. *E.g., Manson*, 432 U.S. at 114; *Raheem v. Kelly*, 257

F.3d 122, 133 (2d Cir. 2001) "'A major factor contributing to the high incidence of miscarriage

of justice from mistaken identification has been the degree of suggestion inherent in the manner

in which the prosecution presents the suspect to witnesses for pretrial identification.'" *Raheem*,

257 F.3d at 133 (quoting *United States v. Wade*, 388 U.S. 218, 228 (1967)). The so-called "show-

up" procedure has been characterized by an authoritative treatise on criminal law as "'the most

grossly suggestive identification procedure now or ever used by the police.'" *Brisco v. Phillips*,

376 F. Supp.2d 306, 313 (E.D.N.Y. 2005) (quoting WAYNE R. LAFAVE ET AL., CRIMINAL

PROCEDURE § 7.4(f) (2d ed. 1999)). A show-up, as opposed to a line-up or photo array, is

"inherently suggestive" because the defendant is presented singly to the witness by the police. *Id.*

(citing *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 (8th Cir. 1996)). Notwithstanding its

inherent suggestiveness, the show-up procedure violates due process only if it is the product of an "unnecessarily suggestive" procedure. *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir. 1994).

The existence of exigent circumstances weighs in favor of finding that a show-up was not unnecessarily suggestive–such a procedure may be necessary to quickly confirm the identity of a suspect. *See United States v. Bautista*, 23 F.3d at 729 (agreeing with defendant's statement that "[a] prompt showing of a detained suspect at the scene of arrest has a very valid function: to prevent the mistaken arrest of innocent persons"); *United States v. Valez*, 796 F.2d 24, 27 (2d Cir. 1986). Thus, the Second Circuit has instructed that where an officer has "or should have doubts whether a detained suspect is in fact the person sought, the officer must make 'immediate reasonable efforts to confirm the suspect's identity.'" *Id.* (quoting *Valez*, 796 F.2d at 27). For this reason, courts have admitted identification evidence from show-ups held in close temporal and geographic proximity to the crime scene. *See, e.g., United States ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir. 1972) (holding that the show-up was necessary to insure "the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail [was] still fresh"); *United States v. Butler*, 970 F.2d 1017, 1021 (2d Cir. 1992). In this case, the show-up was conducted twenty-five minutes after the robbery in relatively close geographic proximity to the crime, factors that favor a finding that the police used a show-up out of reasonable necessity.

Nevertheless, unnecessary words or actions by the police may amplify the inherent suggestiveness of a show-up and render the identifications derived from it inadmissible. *E.g., Wray v. Johnson*, 202 F.3d 515, 520-21 (2d Cir. 2000) (holding that the show-up identification of

a suspect matching the description of wearing a black hat and long black coat, while suspect was in jail cell, was improperly suggestive).  Here, compounding the suggestiveness already inherent in the show-up procedure utilized this case was the fact that the four witnesses viewed Bratcher simultaneously. *See United States ex rel. Smith v. Redman*, 414 F. Supp. 61, 63 (D. Del. 1976) ("Simultaneous viewing of one suspect by several witnesses should be avoided[.]") (citing *United States v. Wilson*, 435 F.2d 403, 405 (D.C. Cir. 1970) ("While the benefit of a prompt on-the-scene confrontation makes acceptable the necessary suggestiveness of presentation of a single subject (a 'showup'), there is ordinarily no need for the additional element of suggestiveness of identification made at the same time by two or more witnesses in each other's company."). Even though the officer had asked the witnesses to remain silent until he asked for an identification, Ragan, blurted out, "That's him!" Ragan, as the bank's branch manager, was the most senior of the witnesses.[4]  The other witnesses made their identifications after Ragan did so.

Although Bratcher was not handcuffed, he was flanked by two uniformed police officers. The police officer who was inside the bank radioed out to the officers to have Bratcher exit the marked police car and walk toward the bank. This added to the show-up's suggestiveness. *See Brisco*, 376 F. Supp.2d at 315 (finding show-up "highly suggestive" where petitioner was shown to the victim while he was nude from the waist up and surrounded by three uniformed policemen and two marked and one unmarked police vehicles).  Prior to the show-up the witnesses told the police that the robber was wearing a sweatshirt, windbreaker-style pants, and a bandanna, and

---

[4] None of the witnesses testified at the *Wade* hearing, and no reason was given for their failure to be called. Only Ragan and Jones testified at trial about their identifications of Bratcher; the remaining two did not testify at all at trial.

white sneakers with a green Nike® "swish" stripe. At the time of the show-up, Bratcher was not wearing the sweatshirt, windbreaker-style pants, or the bandanna. He was, however, still wearing the distinctive green-and-white sneakers, which added to the suggestiveness. *See id.* (noting that suggestiveness of show-up increased where police made the suspect hold up a wet pair of maroon shorts that fit the "distinctive description of the perpetrator's clothing" given by the victim to police). Based on all of these factors, the Court is compelled to conclude that the show-up procedure was unnecessarily suggestive.

### b.   Reliability

Having found the identification procedure be unduly suggestive, the Court now must weigh the "'corrupting effect of the suggestive[ness]' against other factors indicating that the identification may be independently reliable, for even a suggestive procedure 'does not in itself intrude upon a constitutionally protected interest' if it did not contribute significantly to the identification of the defendant." *Raheem v. Kelly*, 257 F.3d at 135 (quoting *Manson v. Brathwaite*, 432 U.S. at 113, n. 13, 114 and citing *Coleman v. Alabama*, 399 U.S. 1, 5-6 (1970) (plurality opinion of Brennan, J.) (no relief warranted by fact that one of the attackers wore a hat and defendant Coleman was the only participant in the lineup to wear a hat, where it "d[id] not appear that [the witness's] identification of Coleman at the lineup was based on the fact that he remembered that Coleman had worn a hat at the time of the assault")).  The question of independent reliability–the "linchpin in determining admissibility," *Manson*, 432 U.S. at 114–must be considered in light of the totality of the circumstances. *Raheem*, 257 F.3d at 135 (citing *Neil v. Biggers*, 409 U.S. at 199; *Coleman v. Alabama*, 399 U.S. at 4 (plurality opinion of Brennan, J.); *Stovall v. Denno*, 388 U.S. at 302). In *Neil v. Biggers*, the Supreme Court

articulated five factors to be used in assessing the reliability of a pre-trial identification: (1) the witness's opportunity to view the suspect during the crime; (2) the witness's degree of attention; (3) the accuracy of any prior description of the criminal by the witness; (4) the level of certainty demonstrated by the witness at the time of the viewing; and (5) the length of time between the crime and the viewing. 409 U.S. at 199-200; *accord Manson*, 432 U.S. at 113; *Raheem v. Kelly*, 257 F.3d at 135.

The last *Biggers'* factor, the length of time between the crime and the confrontation, lends some independent reliability to the identifications.  Here, the show-up was held about twenty-five minutes after the robbery, which was in close temporal proximity to the crime. The amount of time between the crime and the viewing of Bratcher clearly is acceptable. *See Dunnigan v. Keane*, 137 F.3d 117, 129 (2d Cir. 1998) (three days between crime and show-up procedure); *Brisco*, 376 F. Supp.2d at 317 (one hour and ten minutes). Thus, the Court does not believe it likely that the witnesses would have forgotten what they had observed or that their recollections would have dimmed by the time they related their observations to the police..

In addition, at the time that the identification occurred, exigent circumstances arguably still existed which warranted conducting a show-up. Officer Spaker spotted Bratcher and began pursuing him just as the radio dispatch about the robbery was being broadcast. As soon as he was able to apprehend Bratcher, he immediately brought him back to the bank and the show-up was conducted. Under these circumstances, the Court is comfortable in saying that potential for misidentification was minimized by the "unbroken chain of events – crime, escape, pursuit, apprehension, show-up." *Brisco*, 376 F. Supp.2d at 317.

Turning to the remaining *Biggers'* factors, the Court notes that both Ragan and Jones

testified in detail as to the perpetrator's actions during the robbery and how the robbery occurred. Of the two witnesses, Ragan appeared to have had the better opportunity to view the suspect. She testified that during the robbery, the robber was standing about two and a half to three feet away from her, so that she could see his "very dark" eyes and his "dark" complexion above the top of the bandanna. T.173.[5] When the robber jumped over the counter, the bandanna flew up and Ragan could see that he had a "large nose" that was "very pointy." *Id.* The robber pushed her, causing her to fall to the floor. From that vantage point, Ragan was looking directly up at his buttocks and legs, which were distinctive to her–she described his buttocks as "large" and said that his legs were "thick." Ragan testified that she based her identification of Bratcher on his dark complexion and the appearance of his eyes and nose. She also recognized his "mannerisms," meaning the "way he moved, the way he turned his head and his upper body." T.186. Ragan described it as "[v]ery distinct[.]" *Id.* When the suspect turned around and walked away from the teller window, Ragan recognized his buttocks based on their size and she also remarked on the thickness of his legs. T.187. Ragan did notice that he was wearing white sneakers with a design in a contrasting color, but the robber's footwear was not foundation of her identification. Ragan's confidence in her identification of Bratcher was not shaken on cross-examination. Thus, as to Ragan, the Court views her opportunity to observe the suspect, her degree of attention, the accuracy of her prior description, and her level of certainty as to her identification of Bratcher as indicia of independent reliability. To the extent that Ragan's identification of Bratcher might have been the product of an unduly suggestive procedure, I find that such suggestiveness was cured by  the reliability of her identification.

_____

[5] Citations to "T.__" refer to the trial transcript.

On the other hand, Jones's opportunity to view the robber was not as good as Ragan's; Jones dropped to the floor when Bratcher ordered everyone to get down, so she only could describe his feet and lower half. Jones testified that due to the bandanna, she could not see the robber's face clearly, but she could tell that he was black. T.211. Jones appeared certain of her identification, but she conceded that her identification of Bratcher at the show-up was based solely on her recognition of his sneakers – white with a green Nike® "swish" stripe. T.214. *See Raheem*, 257 F.3d at 139 ("To the extent that either Cooke or Shiloh exhibited certainty, we find it difficult to view that certainty as an indicator of reliability independent of the suggestive lineup, given their lack of recollection as to any physical features of the shooter's face . . . . Whatever their certainty, it was engendered by the suggestive element itself, the black leather coat."). As to Jones, the opportunity to view the suspect, the degree of attention, the accuracy of the prior description, and the level of certainty do not lend independent reliability to her identification. Thus, I find that admitting Jones's identification of Bratcher was error.

### c.  Harmless error analysis

Having found error, I must assess whether the error in admitting Jones's identification testimony resulting from unnecessarily suggestive procedures was harmless, by examining the independent evidence of Bratcher's guilt and insuring that this unrelated corroborating evidence "play[s] no part in the analysis of the identification's reliability.'" *Raheem*, 257 F.3d at 140 (quoting *Manson*, 432 U.S. at 116). The Second Circuit has explicitly rejected the inclusion of unrelated evidence corroborating the defendant's guilt as a "sixth" *Biggers* factor when assessing the reliability of an identification because the inclusion of such evidence "confuses the due process inquiry with harmless-error analysis." *Raheem v. Kelly*, 257 F.3d at 140-41 (rejecting

district court's view that the identifications were reliable because of corroborative evidence of petitioner's guilt–namely, testimony as to petitioner's confession, the evidence that petitioner had committed other murders, and the fact that petitioner possessed a black leather coat, which was a key feature of the witnesses' description of the perpetrator). Reliability in the identification context, the Second Circuit explained, "means essentially that the witness's recollection was "[un]distorted."" *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. at 112 (alteration in original)). Proper inquiry into the reliability of the identification asks whether the identification "provides a foundation on which the factfinder can reasonably depend." *Id.* According to the Second Circuit, this inquiry differs from an inquiry into the trustworthiness of the verdict. *Id.* The *Raheem* panel "concur[red] in the views of those courts that confine their consideration of unrelated corroboration of guilt to their assessment of whether the error in admitting identification testimony resulting from unnecessarily suggestive procedures was harmless." *Id.* at 140-41 (citations omitted).

Thus, as stated above, Raheem instructs that I must assess whether the error in admitting Jones's identification testimony resulting from unnecessarily suggestive procedures was harmless, independent of other evidence of Bratcher's guilt. *Id.* at 141 ("[R]esort to unrelated corroborative evidence is contrary to the Supreme Court's guidance in *Brathwaite* that other evidence indicating a defendant's guilt plays no part in our analysis of reliability.") (citing *United States v. Emanuele*, 51 F.3d 1123, 1128 (3d Cir. 1995)) ("[O]nly factors relating to the reliability of the identification will be relevant to a due process analysis. Independent evidence of culpability will not cure a tainted identification procedure, nor will exculpatory information bar admission of reliable identification testimony. We will consider other evidence only to

determine whether an error, if present, was harmless.") (citation omitted)).

The Court has no difficulty in concluding that, under any standard,[6] any error in admitting Jones's identification of petitioner was harmless. At the outset, Bratcher was seen walking in close proximity to the crime only twenty-five minutes after the crime was committed.  Upon seeing a police car, Bratcher began running, raising the inference of a consciousness of guilt. The clothing recovered from the wooded thicket into which Bratcher was seen running and the pants that he was wearing when apprehended all were stained with red dye containing a special chemical used only in the manufacture of dye packs. The clothing that was stained with dye matched the description of the clothing worn by the perpetrator. In a vehicle linked to Bratcher's wife and, parked in close proximity to Fleet Bank were found thirty-seven thousand dollars in cash and a pillowcase stained with red dye, identical in appearance to that on Bratcher's clothes, in addition to a file containing papers belonging to Bratcher and his wife, conclusively linking Bratcher to the vehicle and its contents. Thus, even without the Jones's identification of Bratcher, or for that matter even Ragan's identification, which I have found not to be the product of a suggestive procedure, the evidence linking him to the robbery was overwhelming. Any error in

_____

[6] The Supreme Court has articulated two different tests for determining whether an error may be overlooked by reason of its harmlessness.  *Brown v. Keane*, 355 F.3d 82, 91 (2d Cir. 2004).  In *Brecht v. Abrahamson*, 406 F.3d 114, the Court held that on *collateral* review of a state conviction, an error will be found to be harmless if it did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In *Chapman v. California*, the Supreme Court held that on *direct* review of a criminal conviction, an error may be overlooked only if it is "harmless beyond a reasonable doubt." 386 U.S. 18, 24 (1967). Following the passage of AEDPA, the Second Circuit repeatedly has questioned whether the "applicable test on habeas review of a state conviction remains the one set forth in *Brecht*, or instead should be a determination whether the state court's decision was contrary to, or involved an unreasonable application of *Chapman*," but has declined to decide the question because it concluded that the result was the same under either test. *Brown*, 355 F.3d at 91 (internal quotation marks and citations omitted); *accord, e.g.*, *Howard v. Walker*, 406 F.3d 114, 124 (2d Cir. 2005); *Benn v. Greiner*, 402 F.3d 100, 105 (2d Cir. 2005); *Cotto v. Herbert*, 331 F.3d 217, 253 (2d Cir. 2003); *Ryan v. Miller*, 303 F.3d 231, 254 (2d Cir. 2002); *Noble v. Kelly*, 246 F.3d 93, 101 n. 5 (2d Cir.), *cert. denied*, 534 U.S. 886 (2001); *Loliscio v. Goord*, 263 F.3d 178, 185 n. 1 (2d Cir. 2001).

admitting the identifications resulting from the suggestive show-up procedure was clearly harmless beyond a reasonable doubt.

**3.      Trial court failed to adequately respond to jury requests**

Bratcher asserts that the trial court "failed to provide the jury with a meaningful response to their request for clarification of the court's instructions" regarding the different degrees of robbery. Petition at 6 (Docket #1). On direct appeal, the Appellate Division held that "[d]efendant failed to preserve for our review his contention that the court did not adequately respond to the jury's request for supplemental instructions[.]" *People v. Bratcher*, 291 A.D.2d at 879, 737 N.Y.S.2d 451 (citing, *inter alia*, *People v. Duncan*, 46 N.Y.2d 74, 80, 412 N.Y.S.2d 833, 385 N.E.2d 572 (N.Y. 1978)). New York's contemporaneous objection rule requires that in order to preserve an issue for appellate review in the New York state courts, the defendant must object to the alleged error at trial, at such time when the trial court has an opportunity to repair the defect. *See* N.Y. Crim. Proc. Law § 470.05(2). The New York Court of Appeals has consistently held that a failure to object to a jury charge at a time when the trial court had an opportunity to effectively correct its instructions does not preserve any question of law for review. *People v. Patterson*, 39 N.Y.2d 288, 383 N.Y.S.2d 573 (N.Y. 1976) (citing N.Y. Crim. Proc. Law § 470.05(2)) (cited in *People v. Duncan*, *supra*). The court in *Patterson* explained that "[s]trict adherence to the requirement that complaint be made in time to permit a correction serves a legitimate State purpose." *Id.* (citing *Henry v. Mississippi*, 379 U.S. 443, 447 (1965)).

**a.      Procedural default**

It is well-established that a federal court should not review a federal claim if the state court decision is based on independent and adequate state substantive or procedural law.

*Coleman v. Thompson*, 501 U.S. 722, 728-31 (1977).  Where, as here, "'the state court explicitly invokes a state procedural bar rule as a separate basis for decision,'" federal habeas review is precluded unless the petitioner can show cause for the default and resulting prejudice, or that a fundamental miscarriage of justice will occur if the federal court does not consider the defaulted claim.  *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (quoting *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989)). In the present case, the state court's reliance on the contemporaneous objection rule in denying the jury instruction claim constituted an adequate and independent basis so as to preclude federal habeas review of this claim *See Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir. 1999) ("[W]e have observed and deferred to New York's consistent application of its contemporaneous objection rules.") (citations omitted).

In his pleadings submitted to this Court, Bratcher has alleged neither cause nor prejudice for the procedural default. Furthermore, Bratcher has not adduced any new evidence which would demonstrate that he is "actually innocent" of the crimes for which he was convicted and therefore entitled to the "fundamental miscarriage of justice" exception. *See Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) ("[A]ctual innocence means factual innocence, not mere legal insufficiency. To demonstrate actual innocence a habeas petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.") (internal citations and quotations omitted). Therefore, this claim is barred from federal habeas review.

**4.     Prosecutorial misconduct on summation**

Bratcher contends that the prosecutor committed misconduct when he stated that (1) the district attorney's office was "not in the business of convicting the wrong person"; (2) the

defense was "smoke screen"; and (3) he "didn't care if [petitioner] had a gun or not, which was a major issue which need[ed] to be established for affirmative defense." Petition at 6 (Docket #1). Respondent argues that Bratcher's claims of prosecutorial misconduct are procedurally defaulted because, on direct appeal, the Appellate Division ruled that

> [d]efendant also failed to preserve for our review his contention that he was deprived of a fair trial by the prosecutor's comments on summation. Defendant either failed to object to the allegedly improper comments or he failed to explain the basis for his general objection to those comments.

*People v. Bratcher*, 291 A.D.2d at 879, 737 N.Y.S.2d 451 (citations omitted). As noted above, New York's contemporaneous objection rule requires that in order to preserve an issue for appellate review in the New York state courts, the defendant must object to the alleged error at trial, at such time when the trial court has an opportunity to repair the defect. N.Y. Crim. Proc. Law § 470.05(2). In addition, New York courts have routinely held in the context of claims of prosecutorial misconduct that "a party's failure to specify the basis for a general objection renders the argument unpreserved for [appellate] review." *People v. Tonge*, 93 N.Y.2d 838, 839-40, 88 N.Y.S.2d 88 (N.Y. 1999) (cited in *Bratcher, supra*); *see also People v. Robinson*, 88 N.Y.2d 1001, 1002, 648 N.Y.S.2d 869 1996) ("[T]o frame and preserve a question of law reviewable by this Court, an objection or exception must be made with sufficient specificity at the trial, when the *nisi prius* court has an opportunity to consider and deal with the asserted error.").

### a.    Procedural default

Because the state court explicitly invoked a state procedural bar rule as an adequate and independent basis for its decision, habeas review of Bratcher's prosecutorial misconduct claim is

precluded. *Velasquez v. Leonardo*, 898 F.2d at 9. This Court has reviewed the trial transcript and found that defense counsel only objected to only one comment during the prosecutor's summation, and it is not one of the remarks about which petitioner complains on habeas review. As to the instances of prosecutorial misconduct raised in the habeas petition, there was no contemporaneous objection made by defense counsel. Thus, as far as the instances of misconduct asserted here are concerned, the state court clearly relied on New York's contemporaneous objection rule in holding that they were unpreserved for appellate review. Courts in this circuit have consistently held that a state court's reliance on defendant's failure to object contemporaneously to a prosecutor's allegedly improper summation constitutes an adequate and independent state ground for deciding the claim. *See*, *e.g.*, *Velasquez*, 898 F.2d at 9 (holding that state court's reliance on contemporaneous objection rule was as an independent and adequate state ground which barred habeas review of claims of prosecutorial misconduct); *Brunson v. Tracy*, 378 F. Supp.2d 100 (E.D.N.Y. 2005) (same); *Garcia v. Lewis*, 188 F.3d at 79 ("[W]e have observed and deferred to New York's consistent application of its contemporaneous objection rules.") (citations omitted). The decision of the state court in disposing of Bratcher's appeal rested on "independent and adequate state grounds" and is necessarily beyond the reach of federal habeas corpus review. *Cotto v. Herbert*, 331 F.3d 217, 238 (2d Cir. 2003).

This Court is permitted reach Bratcher's procedurally defaulted claim only if he can demonstrate both cause for, and prejudice resulting from, the default, or that a fundamental miscarriage of justice will occur should the habeas court fail to consider the claim. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Bratcher has failed to make a showing on any of these elements, and therefore the procedural default cannot be excused. Habeas review of the

-19-

prosecutorial misconduct claim is precluded.

## CONCLUSION

For the reasons stated above, petitioner Deldric Bratcher's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      March 6, 2006
            Rochester, New York.